of the day. The United States v. Watson, number 17-1651. And we'll hear from Mr. Henderson. Good morning. May it please the Court. I'm Peter Henderson. I represent David Watson. This case is, I think, very close to the Williams case from this Court a few years ago. And it is in between J.L. and Navarette. And I think the District Court struggled with which Supreme Court precedent is more in line. Obviously, under this reasonable suspicion and anonymous tip line of cases, we have to deal with whether a tip is sufficiently reliable, whether a tip contains sufficient information of criminality to justify a Terry stop. And on both of those prongs, this case doesn't quite meet that. And, of course, reliability and information can be balanced. If we have a more reliable tip, perhaps less information is required. If we have more information, perhaps less reliability is required. So I think the Court needs to address both of them. The whole theme of these lines of cases is a reluctance to allow police officers on their own to stop people to investigate general criminality versus wanting police officers to be able to intervene in emergency situations. And the status of possession of firearms is an allegation of ongoing criminality, of general criminality, rather than an emergency situation. That's what J.L. held. And that's why Navarette ultimately is not the deciding case here, because Navarette did involve an emergency, where there's an anonymous 911 call made by an adult that she'd nearly been driven off the road by a reckless driver. We see that throughout the cases out of this circuit that have upheld Terry stops, because the tip involved an allegation of an ongoing emergency. Had this tip, for example, alleged there are men across the street pointing guns at each other or threatening people, or there's a domestic dispute and one person has a gun, that would be sufficient. That's an emergency situation. And that's the way the officer remembered it in his testimony. That's right. Incorrectly. Incorrectly. I think that's a problem with the case. What Terry said 50 years ago is the rule that the court decides on is going to govern police conduct. And what happened here is you have a police officer who gets a call and hears the word gun, knows the location of the town, it's a high crime area, knows that there are four black males around a car with a gun and immediately jumps to that conclusion, somebody's pointing a gun at them. Well, what he heard was there were boys, which was an ambiguous term. And if it was indeed children playing with guns, then that is an emergency. Well, I think that justifies checking it out. I mean, I don't think anybody's suggesting that he shouldn't have responded to the call. Right. And as soon as he got there, he would have seen the parking lot and seen there aren't boys here. There were no children. I agree with you there. I'm just saying I think the call wasn't quite four African-American men in the parking lot with guns. That's right. It was boys. And that's exactly why we want the type of response that respects individual liberty while also respecting the police ability to respond to emergencies. Mr. Anderson, could I take you back to the Williams case out of the Madison, Wisconsin area? You said this case is close to that. If it's exactly like it, then you lose. Right. Because you've got two votes in Williams for allowing the stop, if not the frisk, in that case. Right. What differences do you see? So there are a couple differences. Judge Ripple, in his concurrence and dissent, I think summarized the court's opinion well and said we've got allegations that firearms were brandished. We don't have that here. Playing is ambiguous. Make of what you want of that. They were part of a boisterous crowd, which we don't have here. It was late at night outside of a bar. And so there were concerns in the court's opinion, written by Judge Stattmuller, that this might be intoxicated. There's more than just a hunch that this could lead to an unstable, a volatile situation in which people get hurt. In our case, by contrast, the other thing is I don't think Williams specifies the age of the tipster. Here we do have a child making this tip, a 14-year-old child. And they know that, right? And they know that. I mean, that's on the call. It's also in broad daylight in the morning. I think it was about 930. And it doesn't involve this group of 25. I think there were about 25 people in Williams. And so on those facts, I think Williams represents a much more potentially volatile situation. The sort of interesting thing is if Mr. Watson hadn't thrown the gun over his shoulder before he got out of the car, and everybody knew this was going to be a frisk. If he hadn't done that and then had gotten out and been frisked, probably he gets suppressed. And so it's a very. . . Why do you say that? Well, because Williams, the court did hold that the frisk was unlawful. So stopping was not unlawful, but the actual frisk was unlawful. Do you think Navarrette has any effect on Williams insofar, you know, in recognizing that Navarrette upheld the Terry stop there? I mean, do you think its identification of the specific factors that cut in favor of the reasonable suspicion modifies how we should think about Williams? Well, I think Navarrette, the strongest introduction of new factors is reliability of 911 calls. And what the majority in that case decided was 911 calls are reliable, particularly because people know the consequences of calling 911, and we know that it can be recorded, they can face criminal penalties, things like that. That was a fairly heroic assumption. Well, that's what Justice Scalia thought. Justice Scalia thought, you know, to whom is this obvious that these sorts of things have consequences? And so in our case in particular, I don't think any 14-year-old knows, you know, the non-emergency line of the Gary Police Department to call to report something. If you call the police, you call 911. And we know that in our reply brief, people call 911 to call the police. It was Sunday morning, right? I think so, yeah. I'm not sure of the day of the week. But, you know, that's who you call. The other thing is, too, of course, those assumptions about people knowing the consequences of making this call. The 911 operator should know if I've got a child calling 911, it could be anything. You know, it could be a genuine emergency. It could not be. And that's why we trust the adults, the police officers, come to the scene, see what's going on, and then take action, rather than coming to the scene and immediately detaining and then trying to figure out what's going on. I think one of the more disheartening parts of this record is the officer's testimony in court that when he, after he blocked in the car, he came up to the driver, and, well, the driver was talking real reckless about, you know, his rights and things like that. And I think that sort of disregard for the Fourth Amendment shouldn't be condoned. But I'd like to save the remainder of my time for rebuttal, if I may. Thank you, Mr. Anderson. Mr. Holler. Thank you. Good morning, Your Honors, and may it please the Court. This report properly denied Watson's motion to suppress. Based on the 911 call, it was reasonable for the officers to suspect that criminal activity might be afoot and to briefly seize the occupants of the Charger to either confirm or dispel that suspicion. I agree with my opponent. I believe that Navarette and Williams are the controlling precedents in this case. Under Navarette, the ---- Well, I don't think he's quite conceding he loses, though, since in both cases we've got majorities that say, in essence, this is really, really close. Well, this is close as well, Your Honor, but looking at Navarette, the three factors that controlled were that it was an eyewitness account and that it was contemporaneous and that 911 was used. And what was the suspected criminal activity here? I believe the suspected criminal activity was that the firearm might be about to be used in some kind of event or some kind of incident. That's what the officer testified was that this was a specific location that was a frequent site of domestic incidents and of shots fired. It's not illegal, though, to have guns in Indiana or to have them out. It's not, and it's not illegal to stand outside of a bank and to walk back and forth multiple times or any of those other kinds of things. The fact is, as the court has said in Terry and as many other courts have said, reasonable suspicion is the chance that a crime is occurring or may be about to be occurring and may be based on purely innocent conduct. And that's what the point is, is that there are many different levels. There's the Terry stop, there's the frisk, and there's the full-blown arrest that requires probable cause. And so the distinction between Leo, a probable cause case, or Williams, which as it was decided by this court was essentially a frisk case, is that here we are down at the lowest level. We are at the level of purely a stop, a nonconsensual stop, to be sure, but a stop nonetheless. It is the lowest level of intrusion, and there are going to be many instances where there are, because it is a mere chance of criminal activity, that people engaged in purely innocuous conduct are going to be briefly stopped. The stop here lasts approximately six minutes, and asked questions about what's going on to either confirm or dispel. And it may well have been determined that there are no guns here, this is a prank, or there are guns here and we're exercising our perfectly free right under Indiana law to have guns consistent with our permit and to use them. That's not what transpired, and so instead we're on the other side of the fence, we're relating to criminals. Well, on the reliability of the 911 call, which Navarette did emphasize here, it's different circumstances, right, because it's a child, it's a borrowed phone. So the things that the court in Navarette said enhanced reliability, like the ability to trace, the ability to understand consequences, are not present here. I would disagree on both of those. I think, first of all, the ability to trace is clearly present. The 911 caller, the dispatcher in this case, even read the phone number back. So the caller knew. But it was a stranger's phone, right? It was some man, he was using some man's phone. Well, as we pointed out as it came out later in the record, we were able to, through using that number, trace back to the original caller. So the point of Navarette is not whether the individual caller knows, but that there is some indicator and some additional level of reliability that comes through the tracing system that's different from a call that is placed to, say, an anonymous tip line or some random person on the street who cannot be traced back. So it seems to me that at minimum this is consistent with Navarette. The 911 system was used. That's all that was really required in Navarette. And here beyond that, the call is actually read back. The caller knows you have the phone number that is available. And as far as the point of this being a child, Your Honor, this is not a 6-year-old. This is a 14-year-old. My frank belief would be that a 14-year-old is likely going to have more experience and knowledge with phone technology than many adults are. But regardless of that fact, that, again, is not a factor that the Supreme Court heavily relied on and that the dissent argued against. As to whether or not 14-year-olds, 24-year-olds, or 74-year-olds know that the 911 systems are recorded and this information can come back, that did not seem to be a factor that the Court was concerned about in Navarette. And I think that this call is, under the precedent of Navarette, reliable enough, and it is far closer to Navarette than it is to J.L. In fact, I think it's indistinguishable. So that meets the reliability point. The difference between somebody's running me off the road and people have guns that they may well be lawfully entitled to have. Well, I mean, those are different factual circumstances, Your Honor. The difference between criminality and not. Well, the court in Navarette went on to ask the question of whether somebody ran me off the road is indicating of criminal activity or if it's just a possibility that somebody was swerving because they were doing something else. So how about this possibility, Mr. Holler? I see somebody driving down the road. It looks to me like they're looking down at a screen in Indiana of a handheld phone, and they're sipping from a cup. It's possible that what they're sipping from is laced with alcohol so that they're drinking while driving, and it's possible that they're texting, but it's also possible that they're checking map directions on their phone. If I call and say there's somebody, 911, somebody's looking down at a screen and drinking while they're driving, is that enough to stop them? Well, I suspect that it's probably not, although the question in that case would be to stop. It's not. It's Pantyagua. I was going to say, I believe there's a case on that point. But the point in that case, though, is we've moved beyond the question of whether it's you calling, anyone else, a child calling, or a police officer observing. It's simply not enough to stop somebody to believe that there's any kind of crime that's been committed. I don't believe that the call in this case presented probable cause or even I'm sorry, did not present probable cause that a crime had been committed, but I also believe if one reads the court's opinion in Navarrette, I don't think the Supreme Court felt that there was probable cause to believe the mere fact that somebody ran somebody off the road is enough, without knowing more facts about exactly what they meant by that, to believe that there's probable cause to believe a crime was committed there. They believe there was only reasonable suspicion to investigate further, to see whether this person was engaged in drunk driving, to see whether this person was engaged in criminal activity. That's what we have here is reasonable suspicion to see whether there is any criminal activity. Well, not just to look, but to seize the individuals and restrain their liberty and use reasonable force if necessary to require them to remain subject in custody, right? That is correct, Your Honor. So what's wrong in this situation with just walking and talking? Well, as I believe the district court itself said, that would have been a possible alternative. So I don't know that there's anything wrong with that. I believe based on the reactions of the individuals in this circumstance, they would have declined to talk. Okay. That would be their right if there wasn't reasonable suspicion. That would be their right if there wasn't reasonable suspicion. We believe there was reasonable suspicion here. So, I mean, all I can point out is that there are firearms involved here. There were firearms that were out, and under those kinds of circumstances, in a high crime area, in an area where firearms have in the past been used for illegal conduct, it is reasonable to investigate to determine whether that is what is going to be happening here. But investigate is one thing. Seize is another. And that's what the government's position seems to lose sight of here. You say in your brief the fact that others with firearms had used them unlawfully at the same building and lot provided at least some reason to think that the people seen by the 911 caller might do likewise. That's an extraordinary argument. Well, I believe, Your Honor, that there is reason to suspect that when I think at any instance where there are firearms out, where there are people who are using firearms, displaying, playing with, have them out, there is nothing wrong with officers briefly coming up, stopping them and saying, can you please tell me why you have your firearm out and what you're doing with it? I don't think that's anything like Delaware's trust. They're perfectly entitled to them. Nobody thinks that they cannot ask that question. The question is whether they're entitled to seize the liberty, to seize those individuals and deny them of their liberty while that question goes forward. And by the way, is there any doubt here that the officers were committed to frisking the individuals in the car once they had enough officers on the scene? I think that is what they were going to do. There's no doubt about that. As to whether there's any doubt, I don't know. But I think that was their plan. Is that the practice of the Gary police in essence? Anybody we talk to, we're going to stop and frisk? No, I don't believe that is the practice. We're going to stop? I think under the circumstances, if they hear a report that there are guns out in an area that is a hot spot, I believe it would be their practice to stop and to investigate further. Yes, I believe that they probably would do that. With a full-blown Terry stop as opposed to walk and talk? I don't know exactly how. I believe that the answer to that question is probably yes, Your Honor, because I believe to do a walk and talk when you have received a report that there are multiple people, which they confirmed there were four people and at least two firearms, I think the officers would say it would likely endanger officer safety to simply walk up and approach somebody without taking some effort to block them in and to detain them. So I think that probably, yes, in order to protect officers and to protect the public, I think it is important that those kinds of steps be permitted to be taken. And those are concerns. And I don't think we need anything in Florida v. J.L. to say, while there certainly is no firearms exception, that one cannot consider the nature of the call and the firearms nature of the call. That's something that in many of the cases we have cited, the fact that there are firearms involved is something that is much greater in this instance than there are in cases like Gentry v. Sevier or Packer or other cases where there's no involvement of firearms. And so for those reasons, we do believe the district court got it right. And I see I'm out of time, but we would ask that the district court's judgment be affirmed. Thank you, Mr. Holler. Thank you. Mr. Henderson, any rebuttal? I'll just pick up where my friend left off on J.L. That is the controlling case. The argument is essentially from the other side that, well, we've got an eyewitness account of criminal activity, and then, well, what is that criminal activity? Well, it's having a gun, but we think something else might have happened. In other words, there wasn't actually an eyewitness account of criminal activity.  It could or might have been something that the police wanted to look into. Firearms are something the police want to make sure nothing bad happens with. But what might happen in the future based on a citizen's neighborhood, even though that citizen has a Second Amendment right to carry a firearm, is the sort of mere speculation and hunches that the Terry court did not want to condone seizures upon. And so I think that's really the key fact here is we don't have sufficient information that would justify a Terry stop. And the fact that it came from this anonymous source, a 14-year-old child using somebody else's phone, just doesn't rise to the level of reasonable suspicion. That allows officers to seize and then investigate. And I think this court should enforce the Fourth Amendment and tell police officers the sequence is investigate and then seize rather than the other way around. Thank you very much. Thank you, Mr. Henderson. The case will be taken under advisement.